No. PD-0704-2015 **704-15**

IN THE

COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

ORIGINAL

Anthony David Teague

V.

THE STATE OF TEXAS

From Appeal No. 06-14-00053-CR

Trial Cause No. 366-82919-2013

Collin County

## Petition for Discretionary Review

RECEIVED IN
COURT OF CRIMINAL APPEALS

JUL 30 2015

FILED IN
COURT OF CRIMINAL APPEALS

JUL 30 2015

Abel Acosta, Clerk

## Identity of Judge, Parties, and Counsel

THE HONORABLE Scott J. Becker - trial court judge
Anthony David Teague - Defendant-Petitioner
THE STATE OF TEXAS

Brock H. Duke - counsel for Defendant 206 S, Kentucky Ste. 101 McKinney, Texas 75069 (trial)

Holly Frymire Griffin and Jonathan Richardson - counsel for state 2100 Bloomdale Rd. Ste. 200 McKinney, Texas 75069 (trial)

Shawn S. Ismail - counsel for defendant 1400 Gables Court Plano, Texas 75075 (appeal)

John R. Rolater - counsel for state 2100 Bloomdale Rd. Ste. 200 McKinney, Texas 75069 (appeal)

i

# Table of Contents

Index of Authorities _____ iii

Statement Regarding Oral Argument _____ 1

Statement of the Case _____ 1

Statement of Procedural History _____ 1

Ground for Review _____ 1

_____ 1

Argument _____ 2

Prayer for Relief _____ 2

Certificate of Service _____ 2

Appendix _____ 3

# Index of Authorities

## Cases

Ploeger v. State _____ 1
189 S.W. 3d 799

## Statutes

Texas Penal Code § 6.04 _____ 1

Texas Penal Code § 42.072 _____ 1

Texas Rules of Appellate Procedure Rule 66.3 _____ 1

## Statement Regarding Oral Argument

Ten minutes of oral argument would be helpful for amplification of issues and to make record

## Statement of the Case

Petitioner was charged by indictment with the offense of Stalking in Cause Number 366-80056-2013 (CR VI:20). The case was then assigned to the 219th District Court. (CR VI:66) Petitioner was re-indicted under the current Cause number. (CR V2:217) This matter was tried before a Jury. At the conclusion of trial the Jury found petitioner guilty of Stalking under Texas Penal Code 42.072. (CR V6:1730). Petitioner was sentenced to 20 years incarceration in the Texas Department of Corrections and a $10,000 fine (CR V6:1730)

## Statement of Procedural History

The 6th Court of Appeals of Texarkana affirmed trial court's decision on May 13, 2015. No motion for rehearing was filed

## Grounds for Review

The Court of Appeals erred in holding that the evidence was legally sufficient. (RR Vol 4. P.166) and (RR vol 7 pp. 168-172)

## Argument

The judgment of the Court of Appeals focuses solely on required mental state of the actor to the exclusion of all other contradictory evidence under the statute, namely causation originating from legally irrelevant causes (RR vol 3 pp 219-221 and RR: vol 7 pp. 168-172) Review is appropriate under TRAP R. 66.3(d). See also TPC §6.04 The Court of Appeals decision is also in conflict with another court of appeals decision on the same issue. TRAP R. 66.3(a)

"Contrary to appellant's suggestion in his brief Solis (the victim) testified expressly that she feared that appellant would cause her death or bodily injury because of his behavior" - Ploeger v. State (App. 1 Dist. 2006) 189 S.W. 3d 799 at 810.

The evidence was also legally insufficient to support that a reasonable person would have feared death or bodily injury.

This matter is important to State jurisprudence as the statute is relatively new and has even been declared facially unconstitutional in its prior incarnations. It seems that the record is replete with disagreements on how to apply the

Appellate counsels had similar difficulties. We require guidance from the State's highest court regarding this issue. Even the trial court judge, called this law the "most hideously drafted statute in the history of plethora of law." Without answering such questions as the as-applied unconstitutionality of the statute for vagueness or overbreadth, the legal sufficiency of the evidence is highly questionable.

## Prayer for Relief

Petitioner prays this court reverse his conviction and reform the judgment to reflect acquittal.

## Certificate of Service

I certify that a true copy of the foregoing Petition for Discretionary Review has been forwarded by U.S. Mail, postage prepaid, first class, to the Attorney for State John R. Rolater at 2100 Bloomdale Rd. Ste. 200 McKinney, Texas 75069 and to the State Prosecuting Attorney, P.O. Box 12405, Austin, Texas 78711 on this the 27th day of July, 2015.

X _Anthony David Teague_

Anthony David Teague #1976916
petitioner, pro se
TDCJ Luther Unit
1800 Luther Drive
Navasota, Texas 77868

*citation - RR Vol 3 pp. 219-220

2



# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-14-00053-CR

---

ANTHONY DAVID TEAGUE, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 219th District Court
Collin County, Texas
Trial Court No. 366-82919-2013

---

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

Rachel Kittrell and Anthony David Teague each uttered an understatement during the events leading to Teague's conviction by a Collin County[1] jury for stalking Kittrell. Kittrell told Teague that she had made a mistake in consenting to a brief romantic relationship with him, and Teague told Kittrell that "maybe" he was "a bit obsessed" with her. Between their initial meeting during the summer of 2012 at SMU-in-Plano, where they both enrolled to pursue a graduate program in video game design, and Teague's October 31, 2012, arrest on the stalking charge, Teague's almost incessant communications to, and uninvited pursuit of, Kittrell proved both points.

Teague appeals from his conviction and sentence,[2] complaining that the trial court should have sua sponte examined his competence to stand trial and that the evidence was insufficient to support his conviction. We affirm the judgment of the trial court, because (1) a competency hearing was not required and (2) legally sufficient evidence supports Teague's conviction.

## (1)     A Competency Hearing Was Not Required

In urging error in proceeding to trial despite evidence that Teague was incompetent to stand trial, Teague relies on letters he sent before trial and testimony from various witnesses during trial

---

[1]Originally appealed to the Fifth Court of Appeals in Dallas, Teague's case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). Because this is a transfer case, we apply the precedent of the Dallas Court of Appeals to the extent it differs from our own. *See* TEX. R. APP. P. 41.3.

[2]Teague's conviction was for stalking, a third degree felony. On Teague's plea of "true" to the State's enhancement allegations, the range of punishment was enhanced to that of a second degree felony, and Teague was sentenced to twenty years' imprisonment in the Texas Department of Criminal Justice Correctional Institutions Division.

that, he argues, should have alerted the trial court that a competency inquiry was necessary. We disagree.

A fundamental principle of our criminal justice system is "that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). Due process prohibits the conviction of a mentally incompetent person. *Turner v. State*, 422 S.W.3d 676, 688 (Tex. Crim. App. 2013); *Corley v. State*, 582 S.W.2d 815, 818 (Tex. Crim. App. 1979) (citing *Bishop v. United States*, 350 U.S. 961 (1956)).

A competency hearing is separate from and independent of a trial. TEX. CODE CRIM. PROC. ANN. art. 46B.005 (West 2006). "'The purpose of a separate hearing is to allow a determination uncluttered by evidence of the offense itself'" since guilt is not an issue. *Lasiter v. State*, 283 S.W.3d 909, 915 (Tex. App.—Beaumont 2009, pet. ref'd) (quoting *Basham v. State*, 608 S.W.2d 677, 679 (Tex. Crim. App. 1980)). Under Texas law, a suggestion of incompetency triggers a requirement for the trial court to conduct an informal inquiry into the defendant's competence. TEX. CODE CRIM. PROC. ANN. art. 46B.004(c–1) (West Supp. 2014). If the trial court's informal inquiry reveals evidence that would support a finding of incompetence, then the trial court must proceed to a formal competency trial. TEX. CODE CRIM. PROC. ANN. art. 46B.005. Under subsection (c), a competency trial is required if requested by counsel.[3] *Id.*

---

[3] Although it is not determinative of the issue before us, Teague's trial counsel did not raise the question of Teague's competence to stand trial.

3

"A defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence." TEX. CODE CRIM. PROC. ANN. art. 46B.003(b) (West 2006). Where, however, there is evidence suggesting a defendant would be entitled to a competency hearing, the conviction may be reversed for a violation of the defendant's due process rights even if a hearing was not requested at trial. *Corley*, 582 S.W.2d at 818 (citing *Drope*, 420 U.S. 162); *see Pate v. Robinson*, 383 U.S. 375, 376, 378 (1966). "A person is incompetent to stand trial if the person does not have: (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person." TEX. CODE CRIM. PROC. ANN. art. 46B.003(a) (West 2006).

Any "suggestion of incompetency" to stand trial calls for an informal inquiry. TEX. CODE CRIM. PROC. ANN. art. 46B.004(c–1). A suggestion of incompetency may be based on the trial court's observations related to the defendant's capacity to

> (A)    rationally understand the charges against [him] and the potential consequences of the pending criminal proceedings;
> (B)    disclose to counsel pertinent facts, events, and states of mind;
> (C)    engage in a reasoned choice of legal strategies and options;
> (D)    understand the adversarial nature of criminal proceedings;
> (E)    exhibit appropriate courtroom behavior; and
> (F)    testify,

TEX. CODE CRIM. PROC. ANN. art. 46B.024(1) (West Supp. 2014), or "on any other indication that the defendant is incompetent to stand trial within the meaning of Article 46B.003." TEX. CODE CRIM. PROC. ANN. art. 46B.004(c–1). Additional considerations include (1) the defendant's current indications of mental illness, (2) the defendant's personal history of mental illness,

(3) whether any condition has lasted or is expected to last continuously for at least one year, (4) the degree of impairment resulting from the mental illness, (5) the specific impact of the mental illness on the defendant's capacity to rationally engage with counsel, and (6) whether the defendant takes psychoactive or other medications and their effect on the defendant's appearance, demeanor, and ability to participate in the proceedings. TEX. CODE CRIM. PROC. ANN. art. 46B.024(2)–(5) (West Supp. 2014).

The Texas Court of Criminal Appeals, however, has unequivocally stated that mental illness, by itself, does not equate to incompetence to stand trial. Only "when a mental illness operates in such a way as to prevent [the defendant] from rationally understanding the proceedings against him or engaging rationally with counsel in the pursuit of his own best interest" does such mental illness rise to the level of incompetence to stand trial. *Turner*, 422 S.W.3d at 691. We review a trial court's failure to conduct a competency inquiry under an abuse-of-discretion standard. *Moore v. State*, 999 S.W.2d 385, 393 (Tex. Crim. App. 1999). A trial court abuses its discretion if its decision is arbitrary or unreasonable. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995).

Even after his arrest, Teague remained quite communicative. Teague's November 2, 2012, letter was five handwritten pages and was addressed to the judge who presided over Teague's initial appearance and his original bond hearing. In his letter, Teague claimed that his wrongful and disruptive behavior as an adult was due to a "neurological condition that can best be described as psychopathy." Teague also admitted in his letter that he had malingered and "feigned" symptoms of psychosis and schizophrenia "in a manipulative attempt to gain sympathy from

5

others," that he had lied and manipulated others habitually, that he had successfully "malingered mental illness" to receive a suspended sentence and community supervision on an unrelated offense, that he sensed Kittrell's vulnerabilities and "manipulated her shamelessly," and that he committed every act set out in the arrest-warrant affidavit, except for one. He asked to receive "psychiatric help in the form of neuroleptic and anti-depressant medications."

Teague's November 5, 2012, letter to the same judge covered ten typewritten, single-spaced pages. With that letter, Teague sought to be considered a candidate for therapy and explained, in great detail, his version of the events leading up to his arrest. Teague wrote about the formalities of "cease and desist" letters and opined that Kittrell was intelligent enough to distinguish between simply telling someone to "stop" their behavior and truly meaning it by sending a "cease and desist" letter. Teague wrote that the State would be unable to prove he committed the offense "as defined under the statute as . . . Kittrell . . . was never in fear for her life or from bodily injury."

Later, Teague wrote letters to the trial judge who presided over this criminal trial. The letters were bizarre, but could easily be understood as an attempt at, well, being bizarre. He added, though, in one, "Two black guys stole my cell phone and sent those texts. I've never even met . . . Kittrell." In another, Teague admitted doing wrong and indicated a desire to ask for forgiveness. In the final letter to this judge, Teague asked for a writ of habeas corpus, asked that his letters be suppressed, discussed the amount of his bond, and claimed ineffective assistance of counsel.

A letter to the clerk of the trial court explained that Teague had directed his attorney "to obtain the psych records of . . . Kittrell and to turn them over to [him] in preparation of [his] legal defense."

Teague contends that, when considered in light of his letters, testimony from various trial witnesses called by the State should have caused the trial court to hold a hearing to determine whether Teague was competent to stand trial. In particular, Teague posits that Steven Kilpatrick's[4] testimony should have alerted the court to the possibility of Teague's incompetence. Kilpatrick testified, "The things about [Kittrell] didn't make sense. He made sense in other ways."

Likewise, Teague contends that Cole Franklin's[5] testimony should have led the trial court to initiate a competency hearing. When asked whether he believed Teague was irrational, Franklin responded,

> To put this in context, we would be talking about a completely different subject and then he would snap to asking about [Kittrell]. He'd say [Kittrell] never mentioned the relationship with me? She never talked about me? You know, we would be talking about a completely different subject. And this happened periodically throughout the conversation.

In addition, Teague contends that the testimony of Ashley Haynie[6] was evidence of his incompetence to stand trial and that her testimony should have triggered action from the trial court. Haynie testified, "And so it was completely irrational being that that was very frightening in that

---

[4]Kittrell spent the night at the home of Kilpatrick and his wife on at least one occasion because she was afraid of Teague.

[5]Franklin and Kittrell were classmates and friends. Teague and Franklin were acquaintances.

[6]Haynie was Kittrell's roommate.

7

way because he would go from demanding to be let in to acting like nothing had happened at all, as if it was completely normal."

To further support his argument, Teague points to the punishment phase testimony of Linda Werner,[7] who testified that Teague's community supervision for an unrelated offense was revoked because he failed to report, failed to maintain employment, and failed to attend mandated mental health sessions. Finally, Teague points to the testimony of Brian Frantz, a Plano police officer who was dispatched to Kittrell's apartment October 28, 2012, after Kittrell reported Teague's harassing behavior. At trial, Frantz testified that Teague called Kittrell's apartment while Frantz was there investigating her complaint. Frantz spoke to Teague over the telephone at that time. According to Frantz, Teague never accepted during that telephone conversation that Frantz was actually a police officer. Rather, according to Frantz, Teague asked who he was really speaking to and accused Frantz on numerous occasions of having a romantic relationship with Kittrell. In describing Teague's behavior during that October 28 telephone conversation, Frantz stated, "I don't know that you can call it irrational necessarily, but definitely nonbelieving."

Teague's letters are rife with content demonstrating his rational understanding of the charges against him and of the potential consequences of future proceedings. *See* TEX. CODE CRIM. PROC. ANN. art. 46B.024(1)(A). In the various letters he sent to the two trial judges involved with this case, Teague demonstrated a good grasp of the facts and his legal situation. This factor weighs against a suggestion of incompetency.

---

[7]Werner is a United States probation and pretrial services officer with the United Stated District Court for the Eastern District of Texas, and she supervised Teague while he was on community supervision for an unrelated offense.

8

Teague's writings also demonstrate that he was more than capable of disclosing facts and events to his counsel, as well as relating his state of mind and what he perceived to be Kittrell's state of mind. *See* TEX. CODE CRIM. PROC. ANN. art 46B.024(1)(B). Teague's letter of November 5, 2012, recounts in great detail the events leading up to his arrest, defenses to his actions, an argument that Kittrell was to blame, and his disbelief that Kittrell's state of mind was one of fear of harm or bodily injury. These statements and others in the letters are strong indicators that Teague understood the concept of "state of mind" and was capable of conveying this type of information to his counsel. Teague's level of understanding weighs against a suggestion of incompetency.

In addition, Teague's letters demonstrate that, not only could he make reasoned choices regarding legal strategies and options, but he actually understands the legal process much better than the average layperson. *See* TEX. CODE CRIM. PROC. ANN. art 46B.024(1)(C). Teague's communications to the trial court spoke of cease and desist letters; the filing of a civil lawsuit against SMU for breach of contract, promissory estoppel, defamation, and specific performance; the State's burden of proof; the *mens rea* element of the crime of stalking; protective orders and violations of protective orders; irreparable harm; requests for continuances; requests for psychological records; "crafting" a defense; vacating an order increasing his bond; ineffective assistance of counsel; suppression of evidence (Teague's letters); and pursuing litigation under "Title 42 USC Section 1983." Teague's level of understanding weighs against a suggestion of incompetency.

In determining whether Teague understood the adversarial nature of the criminal proceedings against him, we need only look as far as the content of his letters. *See* TEX. CODE CRIM. PROC. ANN. art 46B.024(1)(D). Teague wrote that he "looked forward to beating this case worse than [he] beat [his] wife in front of [his] infant daughter." He also repeatedly requested Kittrell's psychological records in order to "craft" a defense. In addition to Teague's obvious understanding of criminal proceedings that we noted above, he also demonstrated, via his correspondence, his understanding that the purpose of the trial was to give the State an opportunity to prove its case against him and to give him an opportunity to offer a defense for his actions. This factor weighs against a suggestion of incompetency.

There is no evidence showing Teague's inability to exhibit appropriate courtroom behavior. This factor weighs against a suggestion of incompetency. *See* TEX. CODE CRIM. PROC. ANN. art 46B.024(1)(E).

Teague made the choice not to testify during the guilt/innocence and punishment phases of his trial, with the exception of testifying during the punishment phase that he understood his Fifth Amendment rights. *See* TEX. CODE CRIM. PROC. ANN. art 46B.024(1)(F). His choices indicate that he understood his legal rights and availed himself of the right to refuse to testify. This factor weighs against a suggestion of incompetency.

Regarding Teague's claim that the record is "replete with evidence of his incompetent mental state,"[8] Teague concedes in his correspondence that he had malingered and "feigned"

---

[8]In addition to Teague's self-diagnosis of mental health issues, which he mentioned in his letters, there is also evidence in the record regarding his mental health from Thomas A. Grugle, M.D. Dr. Grugle performed a psychiatric evaluation of Teague in 2006, pursuant to a court order while Teague was on probation for an unrelated offense. Interestingly, Dr. Grugle begins his correspondence by saying, "Mr. Teague himself is an unreliable informant, he frequently lies."

symptoms of psychosis and schizophrenia "in a manipulative attempt to gain sympathy from others" and that he had lied and manipulated others habitually. Further, Teague wrote that as a result of successfully "malinger[ing] mental illness," he received a suspended sentence and community supervision in an unrelated matter. Taking Teague's prior manipulative actions into consideration, his assertion of incompetence based on mental health issues becomes less credible on its face.

Even taking into account that Teague wrote some "bizarre" letters to the trial court,[9] when we consider the fact that he admitted in his letters that he had feigned mental illness in an effort to receive some sort of beneficial result, the "bizarre" letters carry little weight in our analysis. Teague's letters reflect that he is an intelligent, well-spoken, educated person who has a good grasp on the legal process. Moreover, even assuming that Teague had (or has) mental health issues, that alone, does not demonstrate that he could not communicate with his counsel or understand the criminal proceedings against him at the time they were occurring. *See Turner*, 422 S.W.3d at 691.

Further, we do not find the testimony highlighted by Teague particularly relevant to the issue of Teague's competence to stand trial. While the subject testimony seems to indicate that

---

Following his impressions of Teague's mental health issues, Dr. Grugle concluded his correspondence by writing, "Mr. Teague is fully competent and responsible for his actions. He is fully capable of understanding the nature of his behavior and the consequences of his actions and should be held accountable." While the doctor's opinion might have been informative at some time in the past, it is little, if any, use in determining the present issue as it is an opinion given well before the time of Teague's jury trial and, therefore, has no evidentiary value as to whether Teague was incompetent at the time of trial.

[9]On first blush, the contents of Teague's July 23, 2013, letter might have been considered as evidence that Teague had mental health issues; however, he specified that his words were metaphorical, conveying to the trial court that he was not writing in literal terms but was instead writing figuratively. Teague's August 7, 2013, correspondence could easily be interpreted in the same manner.

11

Teague was extremely interested in Kittrell, it does not evince, or even suggest, that Teague was incompetent to stand trial.

We find that Teague was sufficiently able to consult with his trial counsel with a reasonable degree of rational understanding and that he had a rational as well as factual understanding of the proceedings against him. The trial court did not abuse its discretion by failing to conduct, sua sponte, an inquiry into Teague's competence to stand trial. We overrule this point of error.

*(2)    Legally Sufficient Evidence Supports Teague's Conviction*

Teague contends the evidence is legally insufficient to support the jury's finding that he *knew or reasonably should have known* that his conduct would cause Kittrell to fear bodily injury or death or, alternatively, that a *reasonable person* would fear bodily injury or death. We disagree.

As indicted in this case, a person commits the offense of stalking

> (a)    . . . if the person, on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that:
>
> > (1)    . . . the actor knows or reasonably should know the other person will regard as threatening:
> >
> > > (A)    bodily injury or death for the other person;
> > >
> > > (B)    bodily injury or death for a member of the other person's family or household . . . ; or
> > >
> > > (C)    that an offense will be committed against the person's property;
> >
> > (2)    causes the other person, [or] a member of the other person's family or household . . . to be placed in fear of bodily injury or death or in fear that an offense will be committed against the other person's property . . . ; and

12

(3)     would cause a reasonable person to:

(A)     fear bodily injury or death for himself or herself;

(B)     fear bodily injury or death for a member of the person's family or household . . . ; or

(C)     fear that an offense will be committed against the person's property . . . .

TEX. PENAL CODE ANN. § 42.072(a) (West Supp. 2014).

Here, the indictment[10] alleged that (1) Teague, (2) on twelve separate occasions and pursuant to the same course of conduct, (3) behaved in a manner specifically directed at Kittrell which he knew or reasonably should have known would cause Kittrell to fear bodily injury or death, (4) which would cause a reasonable person to fear bodily injury or death, and (5) which did cause Kittrell to fear bodily injury or death.

In evaluating legal sufficiency to determine whether a rational jury could have found Teague guilty of the offense of stalking, we will review all the evidence in the light most favorable to the jury's verdict. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.— Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and

---

[10]Teague was originally indicted for stalking in January 2013, under trial court cause number 366-80056-2013. In July 2013, Teague was re-indicted under cause number 366-82919-2013. On January 30, 2014, the trial court granted the State's motion to transfer all filings in cause number 366-80056-2013 to the re-indicted case. On February 11, 2014, the trial court dismissed cause number 366-80056-2013.

13

to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

Before the start of the 2012 fall semester, SMU created a Facebook page that allowed incoming students to get acquainted before classes began. Kittrell met Teague and her roommate, Haynie, through this Facebook page. She met Teague in person shortly after the 2012 fall semester began when a group of students met for dinner. Kittrell and Teague talked often through Facebook, and they spent time together at group functions with fellow students. They talked frequently by telephone and through text messages.

In short order, Teague informed Kittrell that he would like to have a romantic relationship with her. She, however, repeatedly told him that she was not interested because she had recently ended a relationship and was not ready to begin another one. Teague presented gifts to Kittrell on several occasions. With the exceptions of a lighter and cat toys, Kittrell refused to accept the gifts because it made her feel uncomfortable. Despite her repeated refusals, Teague continued lavishing gifts on Kittrell and was adamant that she accept them.

Teague sat behind Kittrell in class and would follow her outside when she took a break. He was jealous of other male classmates who interacted with Kittrell and would make derogatory

14

comments about them. Teague continually told Kittrell that they "should kiss" and/or "have sex" because this was what Kittrell wanted. On or around August 21, 2012, Kittrell and Teague began a brief romantic relationship, which, according to Kittrell, lasted for a seven- to ten-day period. Kittrell testified that she quickly regretted the relationship and told Teague that she had made a mistake and that she was not comfortable continuing the relationship with him. Teague protested that they had not made a mistake and tried to convince Kittrell to continue their relationship. For a brief period of time, Teague relented and abided by Kittrell's wishes to discontinue their relationship. On one occasion, however, Teague and Kittrell were part of a group of students that went out for drinks after a test, and the romantic relationship was rekindled. On August 28, 2012, after meeting with her counselor, Kittrell felt emboldened and told Teague that their romantic relationship was over for good. What followed over the next several weeks, and eventually culminated in the involvement of law enforcement, was an avalanche of text messages, telephone calls, and uninvited and unwelcomed visits from Teague trying to convince Kittrell that she was making the wrong decision to stop seeing him.

On August 28, 2012, Teague sent Kittrell sixty-nine text messages. In the evening, Teague sent a text message and asked if they could talk after he got some work done and "calm[ed] down." Teague had contacted Kittrell repeatedly that day in an attempt to convince her to see him in person. All of his requests were denied. Teague sent a text message to Kittrell at 11:52 p.m. advising her that, if she did not answer his text messages, he was going to come to her apartment.

At 12:07 a.m. on August 29, 2012, still receiving no response from Kittrell, Teague threatened Kittrell when he informed her that she would regret any effort to return a lighter he had

15

given her. Just a few minutes later, Teague informed Kittrell that he was going to send a text message to a mutual friend via SMU's Facebook page revealing his romantic relationship with Kittrell. Teague then followed with a string of unanswered messages, including: "I[']m omw[11] over"; "Don't hang up on me."; "Answer. Now."; "I'm not coming over. Not worth my time."; "Just answer the call."; "We need to talk."; "I won't yell."; and "Please don't make me drive out there." Teague's messages continued with no response from Kittrell. At 4:48 a.m., in an apparent attempt to elicit a response from Kittrell, Teague sent messages indicating that he needed to know if Kittrell was all right and that, if he did not hear from her, he was going to call 9-1-1. Teague contacted law enforcement and had officers dispatched to Kittrell's apartment. On their arrival, Kittrell spoke with the officers. She then wrote to Teague asking him to "[p]lease stop" and to let her sleep.

At trial, Kittrell testified that, on August 30, 2012, Teague sent a text message to her stating that he needed her help because his car had broken down near her house. He asked her to come pick him up at that location. Kittrell informed Teague that she was not comfortable doing that. At that point, Teague informed Kittrell that he was dressed like a "school girl" and confided that he did not want anyone but Kittrell seeing him dressed that way. Kittrell testified that she sent Teague a text message telling him that she believed he was lying, and she persisted in her refusal to pick him up. Teague then admitted that his story was not true and that it was simply a ruse to see her in person. According to Kittrell, that was the point at which she became scared of Teague, both emotionally and physically. She informed Teague that she did not want to see him any place other

---

[11] We assume this means "on my way" over.

16

than school, and she began sleeping with a chair wedged under her door because she was afraid he might hurt her. Kittrell explained to the jury that she realized Teague was irrational, desperate, and quick to become angry and that she did not know what he was capable of. Kittrell was concerned that Teague would break into her apartment.

Following that event and in response to a barrage of text messages from Teague, Kittrell sent Teague a text message August 31, 2012, that stated, "Look, I'm trying to get work done and your texts are bothering and distracting me. Could you please just leave me be and give me space like you said you would?" The first two days of September, Teague sent Kittrell two text messages, but she did not respond to either. On September 3, 2012, Teague resumed his tiresome pattern of incessantly sending text messages to Kittrell. Kittrell repeated her requests that he leave her alone. On September 4, 2012,[12] Teague informed Kittrell that he was coming over to her apartment that evening to talk to her about a "practical idea." Kittrell eventually responded, telling Teague that she wanted to be left alone to do her school work and that she did not want to talk. After Teague's continued prodding, Kittrell wrote, "[I am] not comfortable with this. Please don't. Can't you just respect my feelings or call if you simply must say whatever it is." Teague responded, "No[.] I'm coming in person and you're just going to have to deal with it and it will be okay." Within the next few minutes, Kittrell repeatedly informed Teague that she did not want to see him in person and asked him to "stop." Teague explained to Kittrell that he was not "going to just go away." After completely ignoring Kittrell's instruction not to come to her apartment, Teague sent a text message stating, "I can't stay long, though. I have to hit the gym."

---

[12]Teague sent Kittrell 151 text messages on September 4, 2012.

17

At that point, Kittrell wrote, "Don't come by. You're scaring me." Teague responded, "I understand, but I promise it will be fine. Aren't you ready to stop being scared? I just want some tea." Kittrell responded, "I'm not making tea. I'm not going to talk to you tonight. Don't come by. You're scaring me, and I want you to stop." Teague asked Kittrell if she was "calling the cops," and he then stated that he understood Kittrell's fear because he, too, felt scared. Teague then sent Kittrell a message stating that he was "already en route" to her apartment, that he would only stay ten minutes, and that he was afraid she would call law enforcement and have him arrested.

Following several more text messages, Teague informed Kittrell that he was at her apartment, and he asked her to come downstairs. Kittrell closed the shutters, turned off all the lights, and sat in her room with the door closed. Teague knocked on her apartment door, but she refused to answer the door. Teague continued sending text messages to Kittrell, and Kittrell continued to ask him to leave. Again, Kittrell informed Teague that she was not comfortable talking to him in person. Teague responded that he understood Kittrell's discomfort and that she had "every right to feel that way." Finally, Kittrell relented and informed Teague that, if he would leave, she would talk to him on the telephone for ten minutes. Apparently, Kittrell's proposal was not satisfactory to Teague, and he continued asking to see her in person. In response to his continued requests, Kittrell answered "no" or "please go away" at least five more times. She also told Teague repeatedly that she was not comfortable seeing or talking to him in person. Teague again informed Kittrell that he understood her "anxiety" and asked her how he could make it easier for the two of them to talk in person. After sending another flurry of additional messages, Teague

18

finally left Kittrell's apartment complex. Although he left, he did not stop interacting with Kittrell. He continued sending text messages, despite Kittrell "begging" him to please "just leave [her] alone."

On September 5, 2012, Teague sent a text message to Kittrell apologizing for his behavior and begging her to talk to him. Kittrell refused. Teague then began sending Kittrell text messages via Facebook on September 6, 2012. After several messages to Kittrell telling her, among other things, to "seriously die" and that the world needed less people like her in it, Teague sent the following string of text messages:

[Y]ou deserve much worse[.] [N]ow f[] off before you get it[.]

. . . .

[S]top playing games with people[.] [Y]ou might pull that s[] on the wrong person someday[.]

. . . .

[W]ell if you are going to use me to play head and heart games[,] [I]'m going to jerk off on the phone with you[.] [F]air trade[.] [B]itch[.] [N]ow get f[]ed and play with your cat or something[.] [What] the f[] do [I] care what you do[.] [B]ut burn in hell[.]

. . . .

You are dead to me. Go to hell. . . .

. . . .

[Y]ou don't seem to feel pity for me[.] [Y]ou do respond to fear, though[.] [B]ut [I] hate using that tactic[.] [B]ut [I] get desperate[.]

. . . .

[I]t's always a last resort[.] [W]e all use what works sometimes[.] . . .

19

. . . .

[I] don't like having to scare you[.] . . .

. . . .

[M]aybe [I] am a bit obsessed[.]

After continuing to ask Kittrell if he could see her in person, Kittrell informed Teague that she was "actively afraid" of what he might do if he got too upset. Later, Teague wrote, "[I]'d do just about anything for you[.]" Kittrell responded, "I don't want anything from you[.] Except to be left alone[.]" Teague replied, "[E]xcept that[.]" Teague continued, "[I]f you'd only care enough to talk to me about our problems." Kittrell responded, "[T]here is no 'us' or 'we' no 'our.'" Not to be thwarted, Teague replied, "[B]ut there is[.] [T]here was[.]" Before what seemed to be the end of this lengthy exchange, Teague wrote, "[Y]ou really shouldn't feel scared of me though[.]" He followed this statement by telling her that she should not feel scared of her own thoughts. Kittrell responded that she was not scared of her own thoughts, but of him.

On September 7, 2012, Teague began his text messaging tirade in the morning. While Kittrell was in class, Teague sent her a message via Facebook telling her that he would leave her alone forever if she would go to dinner with him. Although Kittrell informed Teague that she did not want to be alone with him, she eventually agreed and met him at Starbucks. Once Kittrell began talking to Teague, she knew he had no intention of leaving her alone. Kittrell testified that she was afraid of Teague but that she was "desperate" and "naïve" and believed if she met with him in person that he would leave her alone. Kittrell also believed that, because Starbucks was always crowded with customers, it would be a safe place for them to meet.

20

At Starbucks, Teague tried to move closer to Kittrell, but she moved away in an attempt to maintain her distance from him. At one point, Teague attempted to kiss Kittrell, but she told him in a loud voice not to touch her. Kittrell realized she needed to leave, so she soon got in her car and left. Immediately after the Starbucks incident, Teague began calling Kittrell and sending her text messages in an attempt to talk to her again.

On September 8, 2010, Teague sent several text messages to Kittrell. Kittrell did not respond, and Teague sent a message demanding that she not ignore him and threatening that, if she did not show him "some respect," he was going to come to her apartment. In response, Kittrell warned, "Do not come to my apartment." After receiving repeated messages from Kittrell telling him that she did not want to see him, Teague sent a message stating that he was not leaving "this time." He continued, "One way or another you and I are going to talk tonight." After several more unanswered messages, Teague informed Kittrell that she was "[n]ot worth the gas" and that he would see her on Monday. Teague continued sending text messages to Kittrell, but she did not respond.

By September 12, 2012, Kittrell and her roommate had begun staying with friends because they were afraid to be alone in their apartment during the week. That weekend, when Kittrell's roommate was out of town, SMU provided Kittrell with a dorm room. The following weekends when her roommate was away, Kittrell had friends sleep over at her apartment because she was afraid Teague might break in and harm her.

Between September 8, 2012, and October 29, 2012, Kittrell contacted law enforcement regarding Teague's behavior on several different occasions, and her roommate contacted 9-1-1 on

21

her own telephone once. Following her meeting with Teague at Starbucks, between the late evening of September 7 and the early morning hours of September 8, 2012, Kittrell went to Cole Franklin's house, who was Kittrell's and Teague's classmate and a friend of Kittrell's. Kittrell told Franklin that the situation with Teague was getting out of hand and that it was "very overwhelming and scary." She needed someone to talk to about the situation and to get some advice as to how to handle it. While Kittrell was at Franklin's house, Teague sent her a video of a love song. Recalling that Teague had mentioned Franklin earlier that day, Kittrell became even more afraid of Teague because now she believed that Teague was following her and knew where she was.

On the evening of September 8, 2012, Kittrell went back over to Franklin's house to discuss the situation with him again. When she returned to her apartment, she found that her roommate was gone. Kittrell testified that Teague was repeatedly text messaging her and then informed her that he was coming over "and [that] this time he wasn't leaving." Kittrell called 9-1-1 for the first time because she had become afraid of him and that "he would hurt [her]."

On September 9, 2012, Teague had informed Kittrell that he was going to come to her apartment to deliver some of her things. Kittrell's roomate, Haynie, called the police because Kittrell was still afraid of what Teague might do. She testified that "he was irrational and he kept on insisting on seeing [her] in person." She stated, "And I didn't know why he was wanting to see me in person if not to hurt me because anything else you can say if you really want to say it, you can say it over the phone. And he just wouldn't stop." On that same day, the police told Teague to cease all contact with Kittrell.

22

After Kittrell called the police on those two occasions, she informed the University faculty that she was afraid of Teague and did not want him sitting behind her in class or following her after school. In response, the University issued Teague a "cease communication letter," instructing Teague to discontinue any further contact with Kittrell. Thereafter, Kittrell did not see Teague at school, but continued to contact her primarily through text messaging.

On September 13, 2012, Teague met with Plano Detective Phelan, who was investigating Teague's behavior. Detective Phelan told Teague that Kittrell no "longer wished any additional contact, wanted him to cease any and all conduct and that included telephone, email, voice mail, and that kind of thing." The detective also informed Teague that Kittrell was afraid of him. Teague told the detective that he understood and would cease contact with Kittrell. On September 18, 2012, Detective Phelan again told Teague that Kittrell was afraid of him, that she did not want any further contact with him, that she considered the relationship to be over, and that she "didn't want to speak with him." Phelan believed Teague understood the points he was communicating during their conversation.

It was not until October 22, 2012, that Kittrell phoned 9-1-1 again because of Teague's behavior. On that day, Kittrell was visiting Starbucks, which was in close proximity to the school and her apartment, but was not near Teague's residence. While there, Teague walked past her and asked her how she had been. Teague then sat down on a bench. When Kittrell felt she was safe enough to leave without Teague "grabbing" her, she went to her car, got in, and drove back to her apartment. A few minutes after Kittrell arrived home, Teague pulled into the apartment parking lot on his motorcycle and drove past the staircase leading to her apartment. At that point, Kittrell

23

contacted the SMU Police Department and was advised to contact the Plano Police Department via 9-1-1. After following the instructions she was given, the Plano Police Department sent an officer to Kittrell's apartment. On his arrival, Kittrell informed him of the recent events and filed a report. Kittrell testified, "I was terrified because I knew he was there because of me. He followed me there. He often would go to places that were far away from where he lived because he knew I would be there. It was like he was hunting me or something."

On October 28, 2012, Kittrell and her friends were visiting at Franklin's apartment. When she went outside to leave, she found a pack of cigarettes above the door of the driver's side of her car. The cigarettes were the brand Kittrell smoked, and Teague was aware of this. On making this discovery, Kittrell called 9-1-1 on her way home. She also called 9-1-1 a second time on that date. Kittrell testified,

> I was, like, beyond terrified. I lost it. Because he had followed me to a friend's house. He knew I was there. He was clearly trying to leave some kind of message, although I don't know what, except to alert me to his presence. I just didn't feel safe.
> I asked two friends to follow me in their cars to go back home, and I called the police. I had one of my friends stay with me until the police showed up. And then when we got back home later that night around 4:00 in the morning I got a call from an unknown number and I answered it and it was him. So I told him not to contact me anymore and then I called the police again because for all I knew he was still in the area and I didn't want him -- I didn't want him to -- I just didn't want to be alone. I mean, my roommate was there, but I wanted police there. And so I called -- I called the cops.

Teague telephoned Kittrell at least three times before the police officers arrived. After they arrived at her residence, Teague called her again. After handing one of the officers her telephone, the officer answered and informed Teague to stop contacting Kittrell and advised him that any further contact would be considered harassment. Teague was speaking so loudly that Kittrell could hear

24

his voice and could tell he was agitated. In addition to the telephone calls Teague was making to Kittrell, he was also texting her and calling Kittrell's roommate's telephone.

Teague maintains that the State's case was based on a "theory of fear emanating from an irrationally scared individual." He points out that there was no evidence of a history of violence, no protective order against him,[13] no assaults occurred, no weapons were used, nor did he ever threaten violence against Kittrell. Teague contends his actions demonstrate nothing more than his desire to meet with Kittrell and that, based on his behavior, he neither knew nor reasonably should have known that his behavior placed Kittrell in fear of bodily injury or death.

In support of his argument, Teague points to *Pomier v. State*, 326 S.W.3d 373 (Tex. App.— Houston [14th Dist.] 2010, no pet.). In *Pomier*, the testimony showed that, among other things, the appellant physically abused and threatened to harm the victim on multiple occasions. The jury heard evidence that the victim had applied for and obtained protective orders against the appellant because he would not leave her alone. The testimony also revealed that appellant drove by the victim's apartment and continuously called her at home and work. Contrary to Teague's assertion, the appellate court in *Pomier* did not hold that evidence of protective orders, actual physical harm, direct threats of physical harm, or use of a weapon was required for the State to prove the element at issue before us. In fact, proof of a culpable mental state almost invariably depends on circumstantial evidence and may be inferred from any facts tending to prove its existence,

---

[13]On November 12, 2012, following his arrest, Kittrell was successful in obtaining a confidential protective order against Teague. In the order, the court made a finding that Teague had been stalking Kittrell. Pursuant to the protective order, Teague was required to refrain from, among other things, communicating with, harassing, threatening, or going within 500 yards of Kittrell. The protective order was admitted at trial.

25

including the acts, words, and conduct of the accused. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

Here, although Teague's messages to Kittrell might have begun as a series of harmless texts, they soon became overtly demanding and threatening. The sheer number and frequency of the communications are noteworthy. From the beginning, Teague tried to convince Kittrell that her decision to break off the relationship was wrong and bombarded her with text messages, phone calls, and unwanted visits.

The jury heard more than sufficient evidence to show Teague knew[14] or reasonably should have known[15] that Kittrell was in fear of him. The record shows also that Kittrell informed Teague repeatedly that she was afraid of him and that neutral third parties, including officers from both SMU and Plano Police Departments, also communicated to Teague the fact that his behavior was frightening Kittrell.

In this case, the jury heard circumstantial and direct evidence that Teague's emotions quickly escalated, as did his attempts to see Kittrell, despite her many requests and requests from law enforcement that Teague leave her alone. The evidence was sufficient for a rational fact-finder to find that Teague knew or reasonably should have known that Kittrell would regard his conduct as threatening bodily injury or death.

---

[14]The trial court instructed the jury that "[a] person acts knowingly, or with knowledge, with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *See* TEX. PENAL CODE ANN. § 6.03(b) (West 2011).

[15]The trial court instructed the jury that a "reasonable belief means a belief that would be held by an ordinary and prudent person in the same circumstances as the actor."

Teague also contends that a reasonable person would not have felt threatened with bodily harm or death as a result of his actions. We disagree. Despite being told on numerous occasions that Kittrell did not want to speak to Teague or see him, he continued with his tirade of text messages and even went to her apartment after she repeatedly told him that she did not want him to come.

Teague threatened Kittrell in numerous text messages. Some threats were overt. Many were merely suggestive of a threat. Teague "rapid-fired" text messages to Kittrell ordering her "to answer him," not to be "rude," and "answer me or I'm coming over." He informed her that he was masturbating while he was talking to her on the telephone. He called her a variety of disrespectful names. Teague threatened to post some type of intimate or compromising photographs of her on Facebook because she would not give him the attention he desired. Teague attempted to kiss Kittrell and touch her even though she did not want him near her. On more than one occasion, he followed her to her apartment and to a friend's residence. Teague showed up at public places where he knew Kittrell would be. Ominously, he left cigarettes on her car when it was parked outside of a friend's residence in what Kittrell believed was some sort of threat or sign.

Considering Teague's pattern of behaviors, even after being repeatedly warned not to engage in such behavior, the jury could have easily and justifiably found that a reasonable person would have been placed in fear of bodily injury or death.

We overrule this point of error.

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:    March 16, 2015
Date Decided:    May 13, 2015

Do Not Publish